**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

**No. 96-11046**
_____

**ITT COMMERCIAL FINANCE CORPORATION, Et Al,**

Plaintiffs,

**BROKERAGE SERVICES OF AMERICA, INC.,**

Plaintiff-Appellant,

VERSUS

**SAM'S WHOLESALE CLUB,**

Defendant-Appellee.

-----------------------------------

**BROKERAGE SERVICES OF AMERICA, INC.,**

Plaintiff-Appellant,

VERSUS

**WAL-MART STORES, INC., doing business as**
**Sam's Club-Members only,**

Defendant-Appellee.

_____

Appeal from the United States District Court
For the Northern District of Texas

(3:93-CV-2297-H)

_____

March 6, 1998

Before GARWOOD, DUHÉ, and DeMOSS, Circuit Judges.

DeMoss, Circuit Judge:[*]

Brokerage Services of America (BSA) appeals from the district court's final judgment after bench trial, which denied BSA relief on its many claims against Sam's Wholesale, an operating division of Wal-Mart Stores, Inc. (Wal-Mart).[1] BSA asks this Court to reverse the judgment in Wal-Mart's favor and render a judgment in BSA's favor for the hefty sum of $21,000,000. We decline BSA's request and affirm the district court.

## BACKGROUND

## I. The BSA/Wal-Mart Purchasing Contract

In 1990 and 1991, BSA sold computers and computer-related equipment in the retail and wholesale market. In late 1990, BSA began selling to Sam's Wholesale Club, an operating division of Wal-Mart. When Wal-Mart initiated a business relationship with a vendor, it required the new vendor to execute a master vendor agreement. The master vendor agreement defined the material terms of the vendor's ongoing relationship with Wal-Mart, including payment and shipping terms. Additional vendor agreement forms were

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] BSA initially sued Sam's Wholesale Club. BSA named the parent Wal-Mart Stores, Inc. in its amended complaint. Both sides most commonly refer to the defendant as "Wal-Mart" and this opinion will adopt that convention.

2

sometimes executed to update or change information about a particular vendor or transaction. Any further terms material to a particular transaction were typically recorded in a purchase order, which included, on the back of the form, Wal-Mart's standard purchase order terms and conditions. Taken together, the vendor agreement and the purchase order terms and conditions formed the "purchasing contract" between the parties and defined the parties' relative rights and obligations.

Wal-Mart's vendor agreement form contained an integration clause, which provided:

> ALL PURCHASES MADE BY PURCHASER SHALL BE CONTROLLED BY THE PURCHASER'S PURCHASE ORDER "TERMS AND CONDITIONS" WHICH IS ATTACHED AS A PART OF THIS AGREEMENT AND INCLUDED WITH EACH MANUALLY TRANSMITTED ORDER.

One of the purchase order terms and conditions integrated by the integration clause provided:

> Set-off: Purchaser may set off against amounts payable under this order all present and future indebtedness of the Seller to Purchaser arising from this or any other transaction whether or not related thereto.

Taken together, the vendor agreement and purchase order terms and conditions purported to grant Wal-Mart a contractual right to adjust payments to the vendor by deducting therefrom any debit balance or indebtedness owed by the vendor to Wal-Mart.

BSA executed the required forms when it began doing business with Wal-Mart in October 1990. Thereafter, BSA executed several

3

additional vendor agreements.  The district court held that the BSA/Wal-Mart purchasing contract vested Wal-Mart with the right to continually set off any debt BSA owed to Wal-Mart against debt Wal-Mart owed to BSA, without regard to whether the transactions were related.  BSA challenges this holding on appeal.

## II.  BSA's Assignment of a Security Interest

In January 1991, BSA obtained financing for its inventory and other aspects of its business from ITT Commercial Finance Corporation (ITT).[2]  In exchange for the financing, BSA assigned ITT a security interest in BSA's accounts and other intangibles.

BSA and ITT sent notice of the assignment to Wal-Mart.  The top portion of the notice defines the interest assigned.  The bottom portion of the notice is titled "Customer Acknowledgment," and contains the following language:

> The undersigned, referred to in the above Notice of Assignment, hereby acknowledges receipt of the above Notice of Assignment . . . and agrees to make all current and future payments owed to Assigner directly to ITT at the above mailing address, notwithstanding any terms in any agreement, contract, invoice or purchase order to the contrary.

After Wal-Mart received notice of the assignment, Wal-Mart paid sums owed on BSA invoices directly to ITT.  Wal-Mart also reduced some of its payments to BSA by taking certain set-offs against the

---

[2]    ITT recovered $355,072.12 from Wal-Mart for improper adjustments at trial and subsequently settled with Wal-Mart.  ITT is not a party to this appeal.

4

BSA/ITT account.[3]

### III. Wal-Mart's Sales to BSA

During the course of business, both before and after ITT obtained a security interest in BSA's accounts, Wal-Mart customers would return to Wal-Mart merchandise which had been originally sold by BSA to Wal-Mart. Wal-Mart would accept the merchandise and deduct the price of the returned product from BSA's invoice. This transaction was referred to as an "original vendor return." Original vendor returns for BSA merchandise were routinely set off against the BSA/ITT account.

Similarly, Wal-Mart occasionally decided to liquidate certain merchandise from its inventory. In such a case, the inventory might be liquidated by sale to the original vendor or to a different vendor. When Wal-Mart's inventory was liquidated by sale to a vendor other than the original vendor, the transaction was referred to as a "third party return." In the Spring and Summer of 1991, BSA and Wal-mart entered into a series of transactions involving the sale of merchandise to BSA pursuant to a third-party return. With respect to each transaction, Wal-Mart's invoice for the merchandise sold to BSA was set off against the BSA/ITT

---

[3] The parties designate Wal-Mart's balance with BSA after the assignment as the "BSA/ITT" account.

5

account.  In addition to original vendor returns and third party returns, Wal-Mart occasionally adjusted the BSA/ITT account by various sums for shipping, handling, shipping discrepancies or for a contractual amount referred to as "price protection."

When ITT became aware of the various Wal-Mart set-offs posted to the BSA/ITT account, it voiced objection and wanted to prevent further compromise of its security interest in BSA accounts.  To satisfy ITT's concerns, BSA and ITT executed a Supplemental Financing Agreement in September 1991.  The Supplemental Financing Agreement acknowledged and was intended to accommodate Wal-Mart's contractual right to set off its payments to the BSA/ITT account.

In October 1991, Wal-Mart again desired to liquidate merchandise by selling a substantial number of computers and computer-related equipment manufactured by several different companies, including Premier, KLH and Goldstar.  BSA agreed to purchase the merchandise, and the resulting transaction became known as the "Goldstar agreement."

BSA and Wal-Mart memorialized the Goldstar transaction with a separate vendor agreement dated October 25, 1991.[4]  The parties did

---

[4] The October 1991 vendor agreement form lists "BSA Computer Corporation" (BSACC) as the vendor, rather than just "BSA" or "BSA, Inc."  At trial, BSA attempted to defeat Wal-Mart's right to set off the BSA/ITT account for the Goldstar transaction by arguing that BSACC was an entity distinct from BSA, against which Wal-Mart had no pre-existing contractual set off right. The district court rejected that argument, finding that the Goldstar transaction occurred between Wal-Mart and BSA.  BSA expressly declines to challenge that fact finding on appeal.

not, however, reduce the operative terms of the Goldstar agreement to writing by executing a companion purchase order. The operative terms of the Goldstar transaction were thus established by the pre-existing contract rights of the parties pursuant to the master and subsequent vendor agreements and the parties' oral agreement concerning price and other terms applicable to the Goldstar agreement. BSA claims in this suit that Wal-Mart made an oral agreement *not* to set off the BSA/ITT account for the Goldstar transaction, notwithstanding the terms of the pre-existing vendor agreements and the parties' prior course of dealings.

Wal-Mart shipped the Goldstar merchandise directly from its various retail outlets to BSA. Beginning in November 1991, Wal-Mart set off the BSA/ITT account for all of the units shipped, and for various other expenses. Wal-Mart's set-offs eventually totaled $882,752.12.[5] Wal-Mart's posting of the Goldstar transaction resulted in a credit balance owed to Wal-Mart, and Wal-Mart made no further payments to the BSA/ITT account.

Financial pressures caused in part by the fact that BSA was severely undercapitalized forced BSA to liquidate the Goldstar merchandise at a "fire sale" for far less than BSA anticipated when

---

[5] Some of these set-offs were later determined to be unjustified. The district court determined that Wal-Mart was entitled to set off the BSA/ITT account $527,680 for the Goldstar transaction, but disallowed $355,072.12 as improperly set off against the BSA/ITT account. A substantial portion of the amount disallowed was not directly related to the Goldstar transaction. Wal-Mart has not challenged these findings on appeal.

7

it purchased the goods from Wal-Mart. Within thirty days of receiving the Goldstar merchandise, BSA resold most of the Goldstar merchandise for $519,739.82, less than BSA would have owed Wal-Mart for all of the Goldstar merchandise. BSA's next business decision proved to be even more imprudent. Notwithstanding the fact that ITT financed the transaction by way of Wal-Mart's set off, BSA did not pay down on the BSA/ITT account. Rather, BSA deposited the proceeds from its resale of the Goldstar merchandise directly into the BSA bank account, and then diverted the money to run the company and to finance a *new* Wal-Mart transaction.

In December 1991, ITT informed BSA that it would not provide further financing to BSA until the BSA/ITT account was reimbursed for the Goldstar transaction. Nonetheless, ITT subsequently provided BSA with an additional $1.4 million for a Wal-Mart transaction in January 1992.

BSA was unable to resolve its financial difficulties with ITT and did not obtain alternative financing for pending purchase orders. BSA ceased operations and litigation ensued.

### PROCEDURAL HISTORY

BSA sued Wal-Mart in Texas state court, alleging that Wal-Mart's Goldstar set-offs caused ITT to stop financing BSA, which caused BSA to incur $21,000,000 in lost profits and business. BSA stated various grounds for liability, including breach of contract,

8

breach of implied and express warranty, promissory estoppel, tortious interference, violations of the Texas Deceptive Trade Practices Act, negligent misrepresentation and fraud.

Shortly thereafter, ITT brought a separate state court suit against Wal-Mart to recover monies set off against the BSA/ITT account. After Wal-Mart removed the BSA action to federal court, the parties agreed to consolidate the BSA action and the ITT action.

BSA, ITT and Wal-Mart all filed motions for summary judgment. On June 2 and again on June 20, 1995, the district court entered lengthy orders disposing of many of the issues raised by those motions. The remaining issues were tried to the court without a jury from September 11 through September 19, and October 11, 1995 through October 12, 1995. On January 2, 1996, the district court entered findings of fact and conclusions of law. The district court's January 2 Order reaffirmed its earlier holdings and made the following additional findings relevant to this appeal:

1. that Wal-Mart enjoyed a contractual right to set off the BSA/ITT account for returns and other monies owed to Wal-Mart by BSA;

2. that Wal-Mart's pre-existing right to set off the BSA/ITT account was not extinguished by BSA's subsequent assignment of a security interest in its accounts to ITT because ITT obtained the security interest subject to Wal-Mart's set-off right;

3. that Wal-Mart's execution of the acknowledgment portion of the BSA/ITT notice of assignment did not constitute a waiver of defenses under Texas law;

9

4.  that Wal-Mart properly set off $527,680 against the BSA/ITT account for the Goldstar transaction;

5.  that Wal-Mart breached an express warranty by shipping some non-conforming goods, but that BSA failed to offer evidence supporting an award of damages for that breach;

6.  that regardless of whether Wal-Mart orally agreed not to set off the BSA/ITT account for the Goldstar transaction, the express terms of the BSA/Wal-Mart contract giving Wal-Mart a set-off right prevented BSA from enforcing an alleged oral modification of that contract; and

7.  that the relationship between Wal-Mart's breach of an alleged and unenforceable oral modification to the BSA/Wal-Mart purchase contract and the substantial damages alleged by BSA was too remote to justify recovery.

BSA makes four basic arguments on appeal. First, BSA argues that Wal-Mart had no contractual right to set off the BSA/ITT account for monies BSA owed to Wal-Mart. Second, BSA argues that Wal-Mart's set-off right, if any, was terminated by Wal-Mart's acknowledgment of ITT's interest in the BSA/ITT account. Third, BSA maintains that Wal-Mart made and breached a binding oral agreement not to set off the BSA/ITT account for the Goldstar transaction. Fourth, BSA contends that the district court erroneously concluded that BSA failed to prove damages with respect to its breach of warranty claim. Wal-Mart has not cross-appealed.

DISCUSSION

## I.  Wal-Mart's Right to Set Off the BSA/ITT Account

BSA argues that the BSA/Wal-Mart purchasing contract does not provide Wal-Mart with a right to set off the BSA/ITT account for BSA's purchase of the Goldstar merchandise.  We review the district court's construction of an unambiguous contract de novo.  ***Tarrant Distributors Inc. v. Heublein Inc.***, 127 F.3d 375, 377 (5th Cir. 1997) ("[B]ut while interpretation of an unambiguous contract is a question of law, clear error is the standard of review when a district court uses extrinsic evidence to interpret an ambiguous contract.") (internal quotations omitted).

BSA first argues that the rights and duties of the parties are governed exclusively by the October 1991 vendor agreement executed with the Goldstar transaction.  BSA uses this premise to launch several contract interpretation arguments, all of which reach the same conclusion -- that both the integration clause in the vendor agreement and the set-off clause in the purchase order terms and conditions are inapplicable to the Goldstar transaction because Wal-Mart was acting as a "seller" or "vendor," rather than a "purchaser."

BSA is correct that Wal-Mart's right to set off BSA debts cannot be derived from the October 1991 vendor agreement.  The October 1991 vendor agreement was not accompanied by a companion

11

purchase order. There is, therefore, no set-off clause to be integrated by the integration clause. Of equal importance, the integration clause, and therefore the set-off clause, is facially inapplicable when Wal-Mart is acting as a "seller" or "vendor," rather than in its traditional role of "purchaser."[6]

BSA's argument is flawed, however, because it is blind to the reality that the BSA/Wal-Mart relationship and the purchasing contract are defined by more than the October 1991 vendor agreement. The material terms of the BSA/Wal-Mart relationship are defined in the master vendor agreement executed in October 1990, as well as the standard purchase order terms and conditions incorporated therein. With respect to the October 1990 transaction, as well as many others that followed, Wal-Mart was acting in its defined role as "purchaser." Moreover, each of those contracts granted Wal-Mart an ongoing right to set off Wal-Mart debt incurred as a result of the subject transaction by BSA debt incurred as a result of either the subject transaction or future unrelated transactions. The record contains ample evidence that BSA sold Wal-Mart a large volume of product, that both the integration clause and the set-off clause were part and parcel of the vendor agreements and purchase orders executed by BSA and Wal-

---

[6]     The integration clause applies only to "purchases made by purchaser."

12

Mart,[7] that the parties comported themselves in accordance with those provisions, and that the Goldstar transaction was set off against Wal-Mart's pre-existing debt to BSA for product sold pursuant to those agreements. We therefore hold that Wal-Mart's right to set off the BSA/ITT account does not depend upon, and is not derived, from the October 1991 vendor agreement. Rather, Wal-Mart's right arises from the terms of earlier vendor agreements in which Wal-Mart was the purchaser. For those purchases, the integration clause, and the set-off clause integrated by the integration clause, allowed Wal-Mart to deduct the sums BSA owed Wal-Mart for the Goldstar transaction from the balance Wal-Mart owed BSA for earlier purchases. The district court's construction

---

[7] BSA argues that there is no competent evidence of the relevant contract terms in the record. BSA does not argue that the relevant terms do not appear in the purchasing contract or that better copies would disclose different language. BSA simply asserts that it should recover because Wal-Mart failed to produce completely legible copies of the executed vendor agreements. We disagree. The Court spent considerable time pouring over this exceptionally contentious record. Having completed that review, we are convinced that the record contains sufficient testimonial and documentary evidence to establish the relevant terms of the purchasing contract. BSA itself introduced a form vendor agreement illustrating the relevant terms at trial. While it is true that Wal-Mart's copies of the original contracts are copied from microfilm and partially blurred, BSA's objection that Wal-Mart's proof fails for failure to offer better copies is in the nature of a best evidence objection, which should have been pressed at trial. The best evidence rule, as the parties must realize, is subject to a number of exceptions when original documents are, as in this case, unavailable. *See* FED. R. EVID. 1002; FED. R. EVID. 1003; FED. R. EVID. 1004. Moreover, we would in any event decline to allow BSA, who bears the burden of proof, to base a $21,000,000 recovery upon Wal-Mart's failure to tender unavailable documents when neither party disputes the content of the controlling terms.

13

of the contract is affirmed.

## II.  Wal-Mart's Acknowledgment of ITT's Security Interest

BSA argues that Wal-Mart's acknowledgment of ITT's security interest barred Wal-Mart from setting off the BSA/ITT account for the Goldstar transaction.  BSA first reiterates its argument that Wal-Mart's set-off right, if any, must be derived from the October 1991 vendor agreement.  BSA thus concludes that Wal-Mart's set-off right post-dated and was limited by the January 1991 notice of assignment.  *See* TEX. BUS. & COM. CODE § 9.318(a)(2) (assignee is subject to those defenses "which accrue[] before the account debtor receives notification of the assignment").  We have already concluded that Wal-Mart's contractual set-off right does not depend upon the October 1991 vendor agreement, but is derived instead from the master and subsequent vendor agreements and the parties' course of dealing.  Therefore, BSA's argument that Wal-Mart's execution of the notice of assignment preempted accrual of that right must fail.

Alternatively, BSA argues that Wal-Mart's acknowledgment effected a waiver of Wal-Mart's pre-existing right to set off the BSA/ITT account.  *See* TEX. BUS. & COM. CODE § 9.206(a) (providing that an agreement to enforce claims or defenses is enforceable).  The relevant provision of the notice provides that Wal-Mart "agrees to make all current and future payments owed to Assigner [BSA] directly to ITT at the above mailing address notwithstanding any terms in any agreement, contract, invoice or purchase order to the

14

contrary." The notice does not contain the word "waiver," or "defenses," and does not purport to limit Wal-Mart's defenses to payment against either ITT or BSA. The notice simply does not contain the clear and unambiguous type of language that Texas courts have required to support a finding of intentional waiver. *See, e.g.*, ***Jonwilco, Inc. v. C.I.T. Financial Servs.***, 662 S.W.2d 664, 666 (Tex. App.--Houston [14th Dist.] 1983, no writ) (finding waiver where note included statement that "debtor will settle all claims, defenses, set offs and counterclaims it may have against the secured party directly with the secured party, and not set up any thereof against secured party's assignee"); *see also* ***Conoco, Inc. v. Amarillo Nat'l Bank***, 950 S.W.2d 790, 795 (Tex.App.-Amarillo 1997, pet. filed) ("Waiver occurs when a person, who has full knowledge of the material facts, acts or fails to act upon a right which he legally holds, and such act or failure to act is inconsistent with that right or the intention to rely upon that right"). Wal-Mart's execution of the acknowledgment simply bound Wal-Mart, notwithstanding any agreement to the contrary, to make payment directly to ITT. Wal-Mart abided by that agreement by tendering more than $20,000,000 in payments directly to ITT after receiving notice of the assignment. Wal-Mart's execution of the acknowledgment did not waive Wal-Mart's contractual defenses against BSA.

When there has been no express waiver of defenses, Texas law

provides that the rights of an assignee are subject to the terms of the contract between the account debtor and the assignor. TEX. BUS. & COM. CODE § 9.318(a)(1). Thus, ITT accepted the security interest subject to Wal-Mart's pre-existing contractual right to set off the BSA/ITT account. *Conoco*, 950 S.W.2d at 796-97 (applying the first-in-time rule to an analogous dispute). ITT could not obtain any rights greater than those possessed by BSA and BSA cannot now assert that the assignment to ITT effectively expanded its own rights against Wal-Mart by modifying the contract between BSA and Wal-Mart. The district court's determination that Wal-Mart's acknowledgment of ITT's security interest did not extinguish Wal-Mart's contractual set-off right is affirmed.

## III. Oral Modification of the Vendor Agreement for the Goldstar Transaction

BSA claims that Wal-Mart's decision to breach the Goldstar agreement by setting off the cost of the Goldstar merchandise caused ITT to cease financing BSA business, with the result that BSA lost profits and business in the amount of $21,000,000. The district court rejected BSA's theory of the case, finding that the alleged oral agreement not to set off the BSA/ITT account, if any, was legally ineffective to modify the express terms of the purchasing contract, which contained a clause prohibiting oral modification.

Neither the summary judgment record nor the record of trial

16

support the conclusion that Wal-Mart agreed not to set off the BSA/ITT account for the Goldstar transaction. There is evidence suggesting that BSA's President and Wal-Mart's purchasing agent were concerned that ITT would be unhappy if and when the Goldstar transaction was set off against the BSA/ITT account. There is evidence that BSA wanted to sell the Goldstar merchandise quickly and pay Wal-Mart back directly so that ITT would not become involved. There is even evidence that Wal-Mart's buyer hoped to purchase additional product from BSA, or to set off the Goldstar transaction in small increments, to avoid triggering a negative reaction from ITT. Conspicuously absent, however, is any evidence that the parties took the appropriate steps to insure that Wal-Mart would abandon its contract rights and deviate from the parties' prior course of dealing by foregoing payment until BSA was in a position to pay directly.

BSA sold the material quickly at a loss or reduced profit and then failed to use the proceeds to pay either Wal-Mart or ITT. Trial testimony established that a Wal-Mart representative contacted BSA President James Crocco for the express purpose of asking whether ITT was to remain as the payor or factor for purposes of the October 1991 Goldstar vendor agreement. Crocco advised the Wal-Mart representative that ITT should remain part of the deal.

The record does not support the conclusion that Wal-Mart agreed not to exercise its contractual rights by setting off the

17

Goldstar transaction against the BSA/ITT account. It is, therefore, unnecessary to consider whether the parties' failure to record the alleged agreement in writing would have made the agreement unenforceable.[8] The district court's refusal to give effect to the alleged oral agreement not to set off the BSA/ITT account is affirmed.

## IV. Wal-Mart's Breach of Warranty Claim

The district court held that Wal-Mart breached its warranty to provide the Goldstar merchandise new, undamaged and in original boxes. The district court nonetheless declined to award damages for that breach because it also found that BSA had not produced sufficient evidence to establish the damages caused by that breach.

BSA contends that the district court erred because BSA's former Chief Financial Officer Peter Streit offered sufficient testimony to support a damage award. Streit testified that $151,000 was a "fair price reduction" for the non-conforming character of some of the Goldstar merchandise. Streit's testimony was based generally on his familiarity with the market and the condition of the Goldstar merchandise when received. Streit did not offer any detailed accounting of how that figure was

---

[8] Although the district court purported to find the alleged oral agreement unenforceable as a matter of law prior to trial, BSA concedes that the district court received and considered substantial evidence concerning the existence of the agreement at trial.

18

determined. Wal-Mart offered evidence tending to establish that some set-offs had already been credited to the BSA/ITT account.

We review the district court's fact finding that BSA failed to prove ascertainable damages for clear error. *Nichols v. Petroleum Helicopters, Inc.*, 17 F.3d 119, 121 (5th Cir. 1994). The district court expressly rejected Streit's testimony as less than credible. The district court's credibility determination is deserving of great deference. *Burma Navigation Corp. v. Reliant Seahorse MV*, 99 F.3d 652, 657 (5th Cir. 1996). When the district court decides to credit the testimony of one witness over another, the resulting decision "can virtually never be clear error." *Id.* (internal quotations omitted). Having reviewed the record and the arguments offered by the parties, we are not persuaded that the district court's refusal to award damages for breach of warranty was error.

## CONCLUSION

The BSA/Wal-Mart relationship was defined by the master vendor agreement executed in October 1990, and subsequent vendor agreements containing the same terms, as well as Wal-Mart's standard purchase order terms and conditions, which were integrated into the vendor agreement. Taken together, those documents granted Wal-Mart a continuing right to set off the BSA/ITT account for sums BSA owed to Wal-Mart, without regard to whether the BSA debt arose from the same or a different transaction. Wal-Mart's contractual

19

set-off right was unaffected by its acknowledgment that BSA had assigned a security interest to ITT.  Although the issue was tried to the district court, the record contains insufficient evidence to establish that Wal-Mart made any oral agreement not to set off the BSA/ITT account for the Goldstar transaction.  For all of these reasons, Wal-Mart was acting within its rights when it set off the BSA/ITT account for the Goldstar transaction.  Further, the district court's finding that BSA failed to offer sufficient evidence to support a damage award for Wal-Mart's breach of express warranty to deliver only new goods and to refrain from billing shipping and handling charges is supported by the record and is without error.

Accordingly, the district court is AFFIRMED.